# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| CONNIE REGULI and WENDY HANCOCK, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 3:24-cv-00541 |
| | ) | Judge Aleta A. Trauger |
| TRACY HETZEL, ESTATE OF KIMBERLY HELPER, MARY KATHERINE EVINS, LORI RUSS, DAVID O'NEILL[1] and the CITY OF BRENTWOOD, | ) ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM

Plaintiffs Connie Reguli and Wendy Hancock pursue numerous claims under 42 U.S.C. § 1983 and state tort law against various defendants relating to those defendants' involvement in the investigation, indictment, prosecution, and conviction of the plaintiffs for state law felony offenses—convictions that were ultimately reversed by the Tennessee Court of Criminal Appeals.[2] Now before the court are separate Motions to Dismiss filed by defendant Tracy Hetzel (Doc. No.

---

[1] David O'Neill's name is spelled thus in the caption of the Complaint. However, his last name is spelled "O'Neil" in the body of the pleading and in this defendant's Answer. The court presumes that "O'Neil" is the correct spelling and employs that form herein.

[2] *See State v. Hancock*, 678 S.W.3d 226 (Tenn. Ct. Crim. App. 2023); *State v. Reguli*, No. M2022-00143-CCA-R3-CD, 2024 WL 913212 (Tenn. Ct. Crim. App. Mar. 4, 2024), *perm. app. denied* (Tenn. July 18, 2024).

26) and defendants Mary Katherine Evins and the Estate of Kimberly Helper[3] (Doc. No. 23).[4] For the reasons discussed herein, Helper and Evins' motion will be granted with respect to the claims against them under § 1983 and denied with respect to the state law claims. Hetzel's motion will be granted in its entirety.

## I.      FACTUAL AND PROCEDURAL BACKGROUND

Reguli is a former attorney with a "long history of activism for reform in the judicial and executive branches of Tennessee government for family and children's rights." (Doc. No. 1, Compl. ¶ 19.) She alleges that her activism nettled and has been criticized by "members of the Tennessee judicial branch." (*Id.* ¶ 19(m).) She had also "specifically called out Evins [and] Helper" for their purportedly inept prosecution in 2016 of a child rape that had occurred in a county juvenile detention center, and she had had many contentious dealings with the Tennessee Department of Children's Services ("DCS") over the years, in her capacity as an "aggressive and zealous" lawyer representing Middle Tennessee parents under investigation by DCS or who had lost their children to the state's custody. (*Id.* ¶¶ 19(i) & (o).)

Hancock resides in Dekalb County, Tennessee and is the disabled single mother of three children, two of whom were still minors in 2018. (*Id.* ¶¶ 3, 19(n), 20.) While her children were still minors, she was "repeatedly investigated" by the DCS, but none of these investigations resulted in the removal of her children from her custody until 2018, when Reguli was her attorney. (*Id.* ¶¶ 19(n), 22–24, 26.) In August 2018, when yet another DCS investigation was launched, DCS

---

[3] Helper died on March 20, 2023, after the events giving rise to the claims asserted in the Complaint. The claims based on her actions are therefore pursued against her Estate, but the court refers herein to both Helper and her Estate as "Helper."

[4] The other defendants, Brentwood Police Officers Lori Russ and David O'Neil and the City of Brentwood, have been served and filed an Answer to the Complaint, denying liability. (Doc. No. 28.)

employees were "aware of Reguli's aggressive defense of parents, and they knew from Reguli's previous representation of Hancock that they would face a rigorous defense." (*Id.* ¶ 19(n).)

A.     **The August 2018 DCS Investigation**

The Complaint describes at great length the facts leading up to the issuance of an *ex parte* order of removal, obtained by an investigator with the Dekalb County DCS from the Smith County Juvenile Court Judge on Tuesday, August 14, 2018, which had the effect of removing Hancock's minor children from her custody and placing them in DCS custody pending the investigation and resolution of allegations of abuse or neglect by Hancock. It appears from the Complaint that Reguli, as Hancock's attorney, learned from the Dekalb County Juvenile Court Clerk late in the afternoon on Monday, August 13, 2018, that a removal petition had been filed against Hancock, though Reguli was unable to obtain a copy of it, or additional information about it, that day. On August 15, 2018, Reguli learned that the Dekalb County Juvenile Court Judge Collins had signed an *ex parte* removal order for Hancock's minor daughter, B.B., on August 14, 2018. (*Id.* ¶¶ 48–49.)

The Complaint alleges that the *ex parte* removal order was procedurally and substantively invalid and had never been properly served on Hancock or Reguli (*id.* ¶¶ 50, 52), but the fact remains that they knew about it. Nonetheless, Reguli met Hancock at a Comfort Inn hotel where Hancock had been staying with B.B. to "relax" and took them both to her home in Brentwood, Tennessee, "to remain there until Reguli could contact Judge Collins." (*Id.* ¶ 51.) On Thursday, August 16, 2018, officers with the Brentwood Police Department ("BPD") appeared at Reguli's house to remove B.B. and hand her over to DCS. Following this event, both of Hancock's minor children were put in state custody. Reguli and Hancock labored for nine months to fight the "invalid" removal petition, while B.B. and her brother were shuffled from—as described in the Complaint—one "chaotic" and "distress[ing]" foster home placement to another. (*Id.* ¶¶ 57, 63–

66.) Finally, in June 2019, DCS dropped the Hancock children off at their home and dismissed the August 13, 2018 petition. (*Id.* ¶¶ 71–72.)

### B.    The Investigation and Indictment of Reguli and Hancock

While the DCS proceedings were ongoing, defendant Tracy Hetzel, a lawyer with DCS who was involved in the removal of B.B. from Hancock's custody, had "already started her criminal investigation of Reguli and Hancock" in August 2018. (*Id.* ¶ 58.) She "used the juvenile court proceedings to obtain a secret subpoena" to obtain the records of the Comfort Inn, without revealing to Reguli that she had sought or obtained those records. (*Id.*) Hetzel also "obtained the audios of the voice messages Reguli left" and "wrote a narrative that she would use to open the investigation." (*Id.*) She obtained these records for the purpose of providing them to the Williamson County police officers and prosecutors so that they could "start the investigation on Reguli and Hancock." (*Id.*)

In September 2018, Hetzel met with defendant Lori Russ, a detective with the Brentwood Police Department, to talk to her about opening an investigation on Reguli and Hancock. In December 2018, Russ used the criminal investigation as a "pretext" to obtain search warrants for Reguli's social media posts and phone records. (*Id.* ¶ 68.)

By sometime in March 2019, Russ had "already turned over her investigative file for prosecution" to defendants Kim Helper and Mary Katherine Evins. (*Id.* ¶ 69.) Defendants Helper and Evins were at all relevant times the District Attorney General and the Assistant District Attorney, respectfully, for the 21st Judicial District of Tennessee.

In July 2019, Russ informed Reguli that she had Indictments for both Reguli and Hancock. They arranged for a time for both plaintiffs to turn themselves in to the BPD. On that day, Reguli and Hancock were booked and processed. Reguli was released on her own recognizance, while Hancock was required to post a bond, and both plaintiffs remained under conditions of release

pending trial. They did not receive a copy of the Indictment at that time. (*Id.* ¶¶ 73–77.)

When Reguli finally received a copy of the Indictment several days later, she "immediately knew that there was a problem." (*Id.* ¶ 79.) The Indictment charged Hancock for "custodial interference," a Class E felony, and charged Reguli in two felony counts of accessory after the fact and one misdemeanor count of facilitation of a felony for custodial interference. (*Id.*) The Indictment stated that

> Wendy Hancock, being the natural parent of [B.B.], a child younger than eighteen (18) years of age, . . . unlawfully, feloniously and knowingly, did detain said child within this state with the intent to violate a temporary or permanent judgment or court order regarding the custody or care of the child, in violation of Tenn. Code Ann. 39-13-306 . . . .

(*Id.* ¶ 80.) The charges against Reguli were premised upon Hancock's alleged custodial interference and used the same language. (*Id.*)

The actual language of the portion of the statute cited in the Indictment makes it a crime to detain a child "within this state or remove the child from this state *after the expiration of the noncustodial natural or adoptive parent or guardian's lawful period of visitation*, with the intent to violate . . . a temporary or permanent judgment or a court order regarding the custody or care of the child." (*Id.* ¶ 82 (quoting Tenn. Code Ann. § 39-13-306(a)(2) (2021)).)

The plaintiffs allege that District Attorneys Helper and Evins "purposefully excluded language from the statute" defining the offense of custodial interference and that, in doing so, they intentionally "eliminat[ed] an essential element of the crime" from the Indictment—namely, the requirement that a noncustodial parent detain a child after the expiration of the noncustodial parent's "lawful period of visitation"—to "achieve a constitutionally defective indictment and false arrest of Reguli and Hancock." (*Id.* ¶¶ 81, 83.)

The plaintiffs allege that Evins caused "inordinate delay" in the case by failing to produce the state's discovery until six months after the arrest. The discovery file finally turned over to

Reguli and Hancock included a "narrative constructed by Hetzel" in August 2018, asking her supervising DCS attorneys for permission to "approach the Williamson County District Attorney about pursuing criminal charges against Connie Reguli." (*Id.* ¶ 86.) This narrative provided some history of Miller's contacts with Reguli going back to 2017, but it does not "describe any harm or abuse of the Hancock children" and does not ask for legal advice. (*Id.* ¶ 87.) Instead, according to the plaintiffs, it shows that Hetzel was "asking permission . . . to act outside her scope of employment and divert time from her state duties to prosecute Reguli and Hancock criminally." (*Id.*) The plaintiffs also allege that Hetzel, Helper, and Evins were "seasoned attorneys" and "knew that the conduct of Reguli and Hancock was not a crime," because there was never a violation of a visitation order as required by § 39-13-306(a)(2). (*Id.*) Instead, they viewed this as an "opportunity to shut down Reguli as a vigorous advocate for parents and revenge against Hancock for using Reguli as her advocate and counsel." (*Id.*)

### C.     The Trials and Appeals

The charges against Hancock and Reguli were severed and tried separately, with Hancock's trial going first. Evins was the prosecutor for the State of Tennessee in both trials. The presiding judge denied Hancock's motion to dismiss the Indictment based on the missing language. Prior to trial, Evins admitted that there would be no evidence of the violation of a visitation order but maintained that it would nonetheless be a jury question as to whether the defendant violated a visitation order. (*Id.* ¶ 92.) The judge initially observed that whether Hancock violated a visitation order would not be a jury question if, in fact, there was no evidence that such a visitation order even existed. (*Id.*) However, the judge then went further and unilaterally "modified the pattern jury instructions [by] removing the 'expiration of a lawful period of visitation' language."[5] (*Id.* ¶ 94.)

---

[5] According to the Tennessee Court of Criminal Appeals decision reversing Hancock's conviction, both the defense and the State had filed substantially similar proposed jury instructions

The plaintiffs assert that the judge's modification of the Tennessee Pattern Jury Instructions and removal of "an essential element of the crime of custodial interference did not excuse Defendants Helper and Evins for their ongoing malicious prosecution of the Plaintiffs," because they allegedly knew that the "custodial interference prosecution was fatally flawed." (*Id.* ¶¶ 95–96.)

Hancock's case proceeded to trial. At the trial, Hetzel "admitted that she had obtained the video footage from Comfort Inn prior to meeting with Defendant Russ," thus, according to the plaintiffs, effectively admitting that she had collected evidence and investigated the alleged crime herself. (*Id.* ¶ 99.) Based on the flawed jury instruction, Hancock was convicted on one count of custodial interference, a Class E felony, and received a two-year suspended sentence. (*Id.* ¶¶ 103, 105.) Her motion for a new trial was denied. (*Id.* ¶ 115.)

Reguli's attorney moved to continue Reguli's trial until after Hancock's appeal, knowing that, if Hancock's conviction were overturned, Reguli could not be convicted of facilitating or being an accessory after the fact. That motion was denied, but the trial date was ultimately postponed until April 2022. (*Id.* ¶ 111.)[6]

Although he initially denied Reguli's recusal motion, the judge who had presided over Hancock's trial spontaneously recused himself from Reguli's case, and the charges against her proceeded to trial before a different judge. (*Id.* ¶¶ 114.) However, the same instruction defining the offense of custodial interference used in Hancock's trial was also used in Reguli's. (*Id.* ¶ 127.)

---

that "mirrored the pattern jury instructions" and included, as one of the elements of the offense, the requirement that the defendant "detained within the State of Tennessee a child younger than eighteen (18) years of age *after the after the expiration of the non-custodial natural parent's lawful period of visitation.*" *State v. Hancock*, 678 S.W.3d 226, 237 (Tenn. Ct. Crim. App. 2023).

[6] Reguli complains that the timing of the trial assured that she would lose her bid to win the Republican primary nomination for Williamson County Juvenile Court Judge, for which she had previously qualified, and that part of the purpose of the prosecution was to humiliate her and shut down her election bid. (Compl. ¶¶ 111, 117, 139.)

During the trial, Hetzel again "admitted" that she had gathered evidence for the custodial interference investigation by obtaining video records from the Comfort Inn, which she took to Russ and Helper. (*Id.* ¶ 122.) She "admitted" that she collected the evidence because she was "*indignant*" about Reguli's conduct. (*Id.* (emphasis in original).) Russ testified that she had met with Hetzel, Evins, and Captain O'Neil in October 2018 to go over the evidence Hetzel had collected, at which point Russ and O'Neil decided to open their own investigation. (*Id.* ¶ 123.)

Reguli was convicted on April 20, 2022, and she was sentenced to two years' probation and thirty days of incarceration. (*Id.* ¶¶ 128, 144.) Her motion for a new trial was denied, but she remained released on her own recognizance pending the appeal. (*Id.* ¶ 147.) After Hancock's conviction was overturned on appeal in May 2023, the Tennessee Court of Criminal Appeals decision vacating Reguli's conviction was finally issued on March 4, 2024.[7] (*Id.* ¶ 156.) By this time, Reguli's entire career and livelihood had been destroyed, and both plaintiffs had been psychologically traumatized by the ordeal. (*Id.* ¶¶ 157–59.)

---

[7] Hancock's conviction was reversed based on the appellate court's conclusion that the language of the jury instruction crafted by the trial judge omitted an essential element of the offense of custodial intervention set forth in Tenn. Code Ann. § 39-13-306(a)(2) (2021)—specifically, the requirement that "the defendant detained within the State of Tennessee a child younger than eighteen (18) years of age after the expiration of the non-custodial natural parent's lawful period of visitation." *Hancock*, 678 S.W.3d at 237. In Reguli's appeal, the state conceded that the trial court's instruction was "prejudicially erroneous," and the court vacated the conviction on the same grounds. *State v. Reguli*, No. M2022-00143-CCA-R3-CD, 2024 WL 913212, at *6 (Tenn. Ct. Crim. App. Mar. 4, 2024), *perm. appeal denied* (Tenn. July 18, 2024).

As the court observed in both appeals, however, the Tennessee legislature, like the trial judge, was persuaded that the conduct in which Hancock and Reguli had engaged *should* be deemed illegal. The definition of the offense of custodial interference was modified effective July 1, 2023 to include language making it unlawful for a parent (or other custodian) of a child to "[h]arbor or hide the child within or outside this state, knowing that the child has been placed in the custody of the department of children's services pursuant to a protective custody order or an emergency custody order entered by a court. It is not a defense to a violation of this subdivision (a)(6) that the person harboring or hiding the child has not been served with an actual copy of a protective custody order or emergency custody order." Tenn. Code Ann. § 39-13-306(a)(6) (2023).

The plaintiffs assert that the defendants' conduct was "voluntary, intentional, malicious, and fraudulent, intending to produce the consequence of a felony conviction on both Plaintiffs"; that Hetzel "always knew that no crime had been committed" but wanted to "silence" and "neutralize" Reguli; that Helper and Evins sought to "bully" Reguli for "exposing their incompetence in prosecuting child rape"; that Hetzel, Helper, Evins, and Russ abused their positions for the purpose of "get[ting] even" with Reguli and Hancock, as her client; and that Russ and O'Neil pursued the investigation "on behalf of" the City of Brentwood, while also knowing that no crime had occurred. (*Id.* ¶¶ 160, 161, 163–66; *see also id.* ¶¶ 167–69.)

### D. The Claims in this Case

Counts I through III of the Complaint are premised upon 42 U.S.C. § 1983 and assert claims for violations of the Fourth Amendment characterized as malicious prosecution (Count I) (Compl. ¶¶ 187–90), "deprivation of liberty without probable cause" (Count II) (*id.* ¶ 192), and fabricating evidence and "knowingly manufactur[ing] probable cause" (Count III) (*id.* ¶¶ 195, 172 [sic];[8] *see id.* ¶ 195 ("Information may be false if material omissions render an otherwise true statement false.")).[9]

Counts IV and VI assert claims under § 1983 based on the individual defendants' purported violations of the plaintiffs' substantive due process rights protected by the Fourteenth Amendment.

---

[8] In the Complaint, paragraph 195 is followed by a paragraph numbered 172, instead of 196. Each paragraph thereafter is numbered consecutively from 173 through 210 (with some omissions), meaning that there are two sets of paragraphs numbered 172 through 195. The court refers to the Complaint by the original paragraph numbers, using [sic] to indicate the misnumbered set.

[9] Count V purports to state a Fourth Amendment claim that the plaintiffs characterize as "vexatious prosecution." (Compl. ¶¶ 183–85 [sic]). In their Memorandum in Opposition to Hetzel's Motion to Dismiss, the plaintiffs concede that this claim is either duplicitous of the other Fourth Amendment claims or "not recognized as a separate cause of action" and agree that the claim should be dismissed. (Doc. No. 33, at 21.) Count V, therefore, will be dismissed without further discussion.

Count IV appears to claim that the defendants violated the plaintiffs' substantive due process rights by knowingly prosecuting them, despite an absence of subject matter jurisdiction. (*See id.* ¶ 182 [sic] ("[N]either the district attorneys (Helper and Evins) nor the Williamson Count Criminal Court obtained subject matter jurisdiction. . . . Without subject matter jurisdiction, the defendants violated the substantive due process rights of Reguli and Hancock.").) Count VI purports to state a claim against Helper and Evins under § 1983 for "prosecutorial misconduct," based on their intentionally removing an essential element of the crime of custodial interference from the Indictments and pursuing the prosecution, despite knowing that they did not have probable cause or a crime because there was no evidence of a visitation order. (*Id.* ¶ 186 [sic].)

Count VII states that defendants Hetzel, Evins, and Helper (along with Russ and O'Neil) engaged in a conspiracy to violate the plaintiffs' constitutional rights and that each individual defendant committed an overt act in furtherance of the "conspiratorial objective." (*Id.* ¶ 190 [sic].)

Counts VIII through XI articulate claims under state law (malicious prosecution, intentional infliction of emotional distress, abuse of process, and conspiracy to commit the same torts), with respect to which the plaintiffs invoke the court's supplemental jurisdiction. Count XII is asserted against the City of Brentwood only and alleges that the City of Brentwood is liable under 42 U.S.C. § 1983 "under [a] ratification theory." (*Id.* ¶¶ 209–10 [sic].)

Based on these claims, the plaintiffs seek nominal, compensatory, and punitive damages, as well as attorney fees and costs. Defendants Hetzel, Helper, and Evins now seek dismissal of all claims asserted against them under Rule 12(b)(6) of the Federal Rules of Civil Procedure. (*See* Doc. Nos. 23, 24 (Helper & Evins' Motion to Dismiss and supporting Memorandum); Doc. Nos. 26, 27 (Hetzel's Motion to Dismiss and supporting Memorandum).) The plaintiffs oppose both motions. (Doc. Nos. 30, 33.) Hetzel filed a Reply in further support of her motion. (Doc. No. 35.)

## II.  STANDARD OF REVIEW

In ruling on a motion to dismiss under Rule 12(b)(6), the court must "construe the complaint in the light most favorable to the plaintiff, accept all well-pleaded factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff." *Courtright v. City of Battle Creek*, 839 F.3d 513, 518 (6th Cir. 2016). Federal Rule of Civil Procedure 8(a)(2) requires only that a complaint contain "a short and plain statement of the claim." Fed. R. Civ. P. 8(a)(2). However, "[t]he factual allegations in the complaint need to be sufficient to give notice to the defendant as to what claims are alleged, and the plaintiff must plead 'sufficient factual matter' to render the legal claim plausible, *i.e.*, more than merely possible." *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

"The plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). A plaintiff must plead more than "labels and conclusions," "a formulaic recitation of the elements of a cause," or "'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (alteration in original) (quoting *Twombly*, 550 U.S. at 555, 557). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

When presented with a Rule 12(b)(6) motion, the court "may consider the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008) (citing *Amini v. Oberlin Coll.*, 259 F.3d 493, 502 (6th Cir. 2001)). Consideration of extrinsic materials need not convert a motion to dismiss into a motion for summary judgment, "so long as [the materials] are referred to in the complaint and are central to

the claims contained therein." *Rondigo, L.L.C. v. Twp. of Richmond*, 641 F.3d 673, 681 (6th Cir. 2011) (quoting *Bassett*, 528 F.3d at 430); *see also* 5B Charles Alan Wright & Arthur R. Miller, Fed. Practice & Procedure § 1357 (3d ed. updated Apr. 2022) ("Numerous cases . . . have allowed consideration of matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint whose authenticity is unquestioned . . . without converting the motion into one for summary judgment.").

"[W]hen evaluating an affirmative defense in a motion to dismiss, a court must . . . only look to the facts alleged in the plaintiff's complaint, albeit alongside the legal elements of the affirmative defense raised in the defendant's motion to dismiss." *Goins v. Saint Elizabeth Med. Ctr.*, 640 F. Supp. 3d 745, 751 (E.D. Ky. 2022) (citing *Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 613 (6th Cir. 2009)). "If the elements of an affirmative defense are met by the factual allegations contained in the complaint, then the district court may grant the motion to dismiss." *Id.*; *see also Kreipke v. Wayne State Univ.*, 807 F.3d 768, 784 (6th Cir. 2015) ("Where an affirmative defense appears 'clearly on the face of the complaint,' however, a court may dismiss a complaint under Rule 12(b)(6) for failure to state a claim.").

## III. HELPER AND EVINS' MOTION TO DISMISS

Helper and Evins move for dismissal of all claims against them under Rule 12(b)(6). They argue that, insofar as their actions were taken in the traditional role of prosecutors, they are absolutely immune from the plaintiffs' claims for malicious prosecution, deprivation of liberty without probable cause, fabricated evidence, substantive due process violations, prosecutorial misconduct, and conspiracy to commit these torts. Helper and Evins acknowledge that prosecutors enjoy absolute immunity from liability only in relation to acts that fall within the traditional scope of their roles as prosecutors. However, they assert that all of the actions the plaintiffs attribute to

them fall within that scope, such that they are absolutely immune from all claims set forth in the Complaint. (Doc. No. 24, at 8.) In the alternative, they argue that all claims against them for false arrest and malicious prosecution fail, because the plaintiffs cannot show an absence of probable cause or that the Indictment was unlawfully obtained and, further, that Tennessee's *res judicata* law precludes the plaintiffs from challenging the validity of the Indictment. (Id. at 9–10.) Because the court finds, as set forth below, that Helper and Evins are entitled to absolute immunity from the claims asserted against them under § 1983, the court does not reach their other arguments.

Regarding the state law claims, Helper and Evins assert only that the court should decline to exercise supplemental jurisdiction over these claims if it dismisses the federal law claims against them. (Id. at 12.) As discussed below, this argument is without merit.

## A. Federal Claims Under § 1983

### 1. *Absolute Prosecutorial Immunity*

Although § 1983 "on its face admits of no defense of official immunity," the Supreme Court has long recognized that "Congress did not intend § 1983 to abrogate immunities 'well grounded in history and reason.'" *Buckley v. Fitzsimmons*, 509 U.S. 259, 268 (1993) (quoting *Tenney v. Brandhove*, 341 U.S. 367, 376 (1951)). Among such historically established immunities are qualified immunity, which protects public officials from "damages liability for the performance of their discretionary functions when 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known,'" and absolute immunity, which is applied sparingly and entirely protects certain officials from suit altogether—irrespective of whether their conduct was unreasonable and malicious. *Id.* (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The party seeking absolute immunity (unlike a party seeking qualified immunity) bears the burden of proving the entitlement. *Rieves v. Town of Smyrna*, 959 F.3d 678, 690 (6th Cir. 2020) (citing *Burns v. Reed*, 500 U.S. 478, 486 (1991)).

As relevant here, "[a] prosecutor is entitled to absolute immunity when [he] acts 'as an advocate for the State' and engages in activity that is 'intimately associated with the judicial phase of the criminal process.'" *Id.* at 691 (quoting *Prince v. Hicks*, 198 F.3d 607, 611 (6th Cir. 1999), and *Imbler v. Pachtman*, 424 U.S. 409, 430–31 (1976)). Conversely, absolute immunity does not "extend to a prosecutor's administrative and investigative conduct that 'do[es] not relate to [his] preparation for the initiation of a prosecution or for judicial proceedings.'" *Id.* (quoting *Buckley*, 509 U.S. at 273) (alterations in original).

To determine on which side of the line a prosecutor's acts fall, "Supreme Court precedent requires [the court to] apply a 'functional approach.'" *Id.* at 690 (quoting *Buckley*, 509 U.S. at 269). That approach requires the court to consider "the nature of the function performed, not the identity of the actor who performed it." *Id.* And, based on this approach, it has long been accepted that absolute immunity "extends to a prosecutor's conduct in 'initiating a prosecution and in presenting the [government]'s case,'" which also encompasses the "administrative or investigative acts necessary for a prosecutor to initiate or maintain the criminal prosecution." *Id.* at 691 (quoting, first, *Imbler*, 424 U.S. at 431, and then *Ireland v. Tunis*, 113 F.3d 1435, 1447 (6th Cir. 1997)). Thus, for example, "a prosecutor is entitled to absolute immunity for his participation in a probable cause hearing or in filing an information" but would not be entitled to absolute immunity for "plan[ning] and execut[ing] a raid on a suspected weapons cache" or "search[ing] for the clues and corroboration that might give him probable cause to recommend that a suspect be arrested." *Id.* (citations omitted). "While the existence of probable cause can help inform a court's determination that the prosecutor was acting as an advocate, the key inquiry still depends on whether the conduct at issue is intimately connected to the judicial process." *Id.*

"In sum, 'acts undertaken in direct preparation of judicial proceedings . . . warrant absolute immunity, whereas other acts, such as the preliminary gathering of evidence that may ripen into a prosecution, are too attenuated to the judicial process to afford absolute protection." *Adams v. Hanson*, 656 F.3d 397, 402 (6th Cir. 2011) (quoting *Ireland*, 113 F.3d at 1445). "[T]he critical inquiry for immunity purposes is thus how closely related . . . the prosecutor's challenged activity [is] to his role as an advocate intimately associated with the judicial phase of the criminal process." *Id.* at 403 (quotation marks and citation omitted). The court, that is, must determine "whether the actions in question are those of an advocate." *Id.*

Importantly, the question of whether a prosecutor acted with actual malice or dishonesty is irrelevant to the absolute immunity inquiry. As both the Supreme Court and the Sixth Circuit have recognized, the doctrine of absolute immunity for prosecutorial duties is justified by concerns that

> harassment by unfounded litigation would cause a deflection of the prosecutor's energies from his public duties, and the possibility that he would shade his decisions instead of exercising the independence of judgment required by his public trust, thereby prevent[ing] the vigorous and fearless performance of the prosecutor's duty that is essential to the proper functioning of the criminal justice system.

*Id.* at 401 (quoting *Imbler*, 424 U.S. at 423, 427–28) (internal quotation marks omitted). As a result, the application of absolute immunity may "leave the genuinely wronged defendant without civil redress against a prosecutor whose malicious or dishonest action deprives him of liberty." *Imbler*, 424 U.S. at 427.

Because absolute immunity is an affirmative defense for which the defendants bear the burden of proof, dismissal on this basis is appropriate only if "the undisputed facts conclusively establish [the] affirmative defense as a matter of law." *Hensley Mfg.*, 579 F.3d at 613.

### 2. *Malicious Prosecution Claim (Count I)*

Helper and Evins were, respectively, the District Attorney and the Assistant District Attorney for Williamson County at the time of the criminal proceedings against the plaintiffs.

Evins actually conducted the trials on behalf of the state. Once the allegations in the Complaint concerning the plaintiffs' speculation about these defendants' *motivations* for what they did are weeded out, and the facts are pared down to what Helper and Evins purportedly *did*, little is left. Basically, the plaintiffs' claims against Helper and Evins are premised upon their drafting of the Indictment, the presentation of the Indictment to the grand jury, and the prosecution of the criminal charges against Hancock and Reguli. The plaintiffs allege that Helper and Evins took these actions despite actual knowledge that they lacked probable cause, insofar as they intentionally omitted from the Indictment, the grand jury presentment, and their trial presentations an essential element of the crime of custodial interference—namely, the requirement that the defendant detain a child after the expiration of a lawful period of visitation.

The plaintiffs allege in the paragraph identifying defendant Lori Russ that Russ met with Hetzel and Evins at some point to "initiate the investigation" (Compl. ¶ 7), but the Complaint does not allege facts suggesting that Evins directed or participated in that investigation. In fact, the next time after paragraph 7 that Helper's or Evins' name appears in the Complaint is in paragraph 69, where the plaintiffs allege that Russ turned over her investigative file to the prosecutors sometime before March 29, 2019. (*Id.* ¶ 69.) They allege that Evins and Helper together "manipulated the language in the indictment . . . in deliberate disregard of the constitutional rights of the Plaintiffs to be free of malicious prosecution" and that Helper signed the Indictment. (*Id.* ¶¶ 81, 79.) The plaintiffs also allege that Helper filed a motion for an order of protection (which was denied) and that Evins slow-walked the state's production of discovery and then intentionally delayed the commencement of Reguli's trial by pretending to be sick, just to exacerbate Reguli's anxiety. (*Id.* ¶¶ 86, 110.) They allege that Helper and Evins continued to pursue the charges against both Hancock and Reguli, despite knowing that the jury instructions were flawed and that they lacked

probable cause that any crime had been committed at all, and they continued to oppose Reguli's appeal even after Hancock's conviction had been reversed. (*Id.* ¶¶ 93, 95, 106–08.)

In response to Helper's and Evins' arguments that all of their allegedly wrongful conduct consists of "acts undertaken in direct preparation of judicial proceedings," *Adams*, 656 F.3d at 402, the plaintiffs insist that Helper and Evins were engaged in an "administrative role," rather than an advocacy role, when they "prepar[ed] the language of the indictment to exclude an essential element of the statutory offense of custodial interference in order to obtain probable cause." (Doc. No. 30, at 2; *see id.* at 3.) They also argue that Evins acted in an "investigatory role with Defendants Hetzel, O'Neil, and Russ in the initial investigation and decision to pursue prosecution where no crime existed (*id.* at 3), while Helper acted in a "supervisory role" when she "knowingly secur[ed] false and misleading investigation material derived from Evins' participation in the investigation" (*id.* at 2). They argue that both Helper and Evins acted in a "prosecutorial role in which [they] lacked constitutional authority because there was no probable cause and no crime." (*Id.* at 2, 3.)

Regarding the plaintiffs' insistence that Helper and Evins "participated in the investigation and knew that no crime had been committed before the indictment" (*id.* at 10), the Complaint itself does not support an inference that Helper and Evins participated in the investigation, offered legal advice to the police officers, or directed them in their investigative efforts. Instead, Helper and Evins are alleged to have received and reviewed the evidence produced by the police officers' investigation and made the decision to pursue criminal charges, despite the lack of evidence that a crime had actually been committed.

While the *gathering* of evidence is considered "too attenuated to the judicial process to afford absolute protection," the Sixth Circuit has noted that some "investigative acts," if "undertaken in direct preparation of judicial proceedings," are protected by absolute immunity—

"including the professional evaluation of evidence." *Ireland*, 113 F.3d at 1145 (citing *Buckley*, 509 U.S. at 273); *see also id.* at 1447 ("Absolute prosecutorial immunity will likewise attach to administrative or investigative acts necessary for a prosecutor to initiate or maintain the criminal prosecution."). Here, again, the Complaint does not actually allege that Helper or Evins was involved in the gathering of evidence. Instead, they were called upon to review the investigative files turned over to them by the BPD, and they made the decision, however ill-advised or malicious, to prosecute based on that evidence. These actions were taken in their capacity as advocates for the state, conducted during the initial stages of judicial proceedings. Helper and Evins are absolutely immune from liability for the acts of reviewing evidence and deciding to pursue criminal charges. *Accord Adams*, 656 F.3d at 402 ("Absolute immunity also protects a prosecutor when she evaluates evidence and presents that evidence . . . before a grand jury." (citing *Buckley*, 509 U.S. at 273); *Ireland*, 113 F.3d at 1447 ("'[T]he prosecutor's act in seeking an indictment is but the first step in the process of seeking a conviction,' for which we shield the prosecutor because 'any lesser immunity could impair the performance of a central actor in the judicial process.'" (quoting *Malley v. Briggs*, 475 U.S. 335, 343 (1986))).

That decision, along with the actual drafting of the Indictment and the presentment of the government's case to the grand jury, is the true target of the Complaint. And the plaintiffs' assertion in the Complaint that these were "administrative acts" is a statement of law rather than one of fact and, as such, not one the court is required to accept as true in ruling on a Rule 12(b)(6) motion. The decision to prosecute and the preparation of an indictment, regardless of how they are characterized, are "intimately associated with the judicial phase of the criminal process." *Prince*, 198 F.3d at 611 (quoting *Imbler*, 424 U.S. at 409); *accord Prince v. Hicks*, 198 F.3d 607, 614 (6th Cir. 1999) ("[A] prosecutor who initiates criminal proceedings against a suspect whom she had no

probable cause to prosecute is protected by absolute immunity." (citing *Buckley*, 509 U.S. at 274 n.5)). Helper and Evins are absolutely immune from liability for drafting and presenting the Indictment to the grand jury.

All of the other conduct in which Evins allegedly engaged and with respect to which the plaintiffs take issue occurred during the trial and the appeal of the criminal cases and clearly concern litigation decisions—more acts that fall squarely within the "adversarial arena," *Ireland*, 113 F.3d at 1447 n.7. These include Evins' calling in sick to delay the commencement of Reguli's trial, her purportedly "aggressive" and manipulative preparation of Hancock and Hancock's minor daughter to testify at Reguli's trial (*see* Doc. No. 1 ¶¶ 105, 109), her decision to continue to pursue both prosecutions despite allegedly knowing the jury instructions were flawed and that probable cause did not exist, her decision regarding whom to have sit next to her at counsel table during the trial, and so forth. Evins is entitled to absolute immunity in connection with these decisions. *Accord Adams*, 656 F.3d at 402 ("Absolute immunity also protects a prosecutor when she evaluates evidence and presents that evidence at trial . . . , prepares witnesses for trial, . . . and even elicits false testimony from witnesses." (internal citations omitted)); *Barnette v. Cantalamessa*, No. 4:21CV0339, 2021 WL 5040466, at *4 (N.D. Ohio Oct. 29, 2021) ("Prosecutorial functions [entitled to absolute immunity] include participation in probable cause hearings, grand jury hearings, pretrial proceedings, witness preparation, and trials." (citing *Koubriti v. Convertino*, 593 F.3d 459, 467 (6th Cir. 2010)).

### 3. The Other Fourth Amendment Claims

The same facts referenced above form the basis for the plaintiffs' other § 1983 claims alleging Fourth Amendment violations. Helper and Evins are immune from liability under these theories of recovery as well. Specifically, Count II, for "deprivation of liberty without probable cause," is based on the plaintiffs' arrest following their Indictment. The plaintiffs allege that,

despite the absence of probable cause, they

> faced continued deprivation of their liberty from the date of the indictment until their full exoneration. Actions were taken to unnecessarily extend this period such as (1) unnecessary delay in the production of discovery; (2) unnecessary delay in the setting of the criminal trials; and (3) unnecessary delay in the production of transcripts needed for appeal.

(Compl. ¶ 193 [sic].) The only role Helper and Evins had in the plaintiffs' actual arrest was in the procurement of the Indictment, with regard to which they are absolutely immune. Insofar as they allegedly engaged in conduct that had the effect of delaying Reguli's trial and her appeal, as discussed above, those actions too were clearly taken in their role as advocates for the state and, as such, are actions for which they are entitled to absolute immunity.

Likewise, the "fabricated evidence" claim (Count III) is premised upon the allegation that Helper and Evins

> knew that the presentment made to the grand jury materially omitted any evidence of a visitation order that provided for the "expiration of a lawful period of visitation" as required by statute for the purpose of criminalizing the plaintiffs. . . . This was a knowing and intentional[] omission intended to influence the jury and convict the Plaintiffs . . . .

(Compl. ¶ 172 [sic].) Helper and Evins, again, are entitled to absolute immunity with respect to any claim arising out of their presentment of the Indictment to the grand jury, as this action was intimately connected to the judicial process.

### 4. The Fourteenth Amendment Claims

Counts IV and VI, the Fourteenth Amendment claims, asserting a substantive due process violation based on "lack of subject matter jurisdiction" and interference with the plaintiff's right to be "free[] from wrongful prosecution" (Count IV) and "prosecutorial misconduct" (Count VI), fail for the same reason: they are premised upon actions for which the prosecutors are entitled to

absolute immunity.[10] These claims, too, will be dismissed as to Helper and Evins.[11]

               5.       *Section 1983 Conspiracy*

Insofar as the conspiracy claim against Helper and Evins is premised upon the same conduct referenced above, with respect to which they are absolutely immune, they are also entitled to absolute immunity from the conspiracy claim. *Accord Grant v. Hollenbach*, 870 F.2d 1135 (6th Cir. 1989) (holding that county prosecutors were absolutely immune from civil rights suit alleging they conspired to knowingly bring false charges of child abuse because the challenged conduct occurred while the prosecutors were functioning in an advocatory role).

In addition, conspiracy claims must be pleaded with some degree of specificity. *Hamilton v. City of Romulus*, 409 F. App'x 826, 835–36 (6th Cir. 2010) (citing *Spadafore v. Gardner*, 330 F.3d 849, 854 (6th Cir. 2003)). Vague and conclusory allegations unsupported by material facts are insufficient. *Id.* The Complaint here fails under this standard to allege sufficient facts to establish Helper and Evins' engagement in a conspiracy to violate the plaintiffs' constitutional rights.

---

[10] Moreover, as discussed below in connection with Hetzel's Motion to Dismiss, Counts IV and VI do not state cognizable claims.

[11] To be sure, while prosecutorial misconduct in the course of judicial proceedings does not give rise to civil liability on the part of the prosecutors, it may result in the dismissal of an indictment, the reversal of a conviction, or the setting aside of a criminal conviction in collateral proceedings under 28 U.S.C. § 2254 or § 2255. *See, e.g.*, *State v. Griffin*, No. E2001-01233-CCA-R3CD, 2002 WL 31769090, at *1 (Tenn. Crim. App. Dec. 11, 2002) (recognizing that dismissal of an indictment may be warranted in some circumstances but affirming the denial of the defendant's motion to dismiss the indictment due to prosecutorial delay, finding his right to a speedy trial had not been violated); *United States v. Eaton*, 784 F.3d 298, 309 (6th Cir. 2015) (articulating factors relevant to determination of whether improper prosecutorial statements constituting misconduct were so "flagrant . . . that a reversal [was] warranted"); *Macias v. Makowski*, 291 F.3d 447, 451 (6th Cir. 2002) (stating that the standard for determining "whether prosecutorial misconduct mandates that habeas relief be granted" requires a showing that the prosecutor's comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process").

The conspiracy claim against Helper and Evins will also be dismissed.

**B.      State Law Claims Against Helper and Evins**

Helper and Evins' only argument for the dismissal of the state law claims against them is that the court should decline to exercise supplemental jurisdiction over the pendent state claims once the court has "dismissed all claims over which it has original jurisdiction." (Doc. No. 24, at 12 (quoting 28 U.S.C. § 1367(c)(3)).)

The problem with this argument is that, although the court will dismiss all of the § 1983 claims asserted against *Helper and Evins*, that does not mean that the court is dismissing all claims over which it has original jurisdiction. Some of the defendants in this action have not moved for dismissal, and the federal and state claims against those defendants remain pending. Section 1367(c)(3), therefore, does not authorize dismissal of the state law claims against Helper and Evins. Their motion will be denied with respect to these claims.

## IV.     HETZEL'S MOTION TO DISMISS

Hetzel's motion is also premised upon Rule 12(b)(6). Regarding the claims under § 1983, she asserts that (1) she is entitled to both absolute and qualified immunity as to Count I, for malicious prosecution, and alternatively that the Complaint fails to allege sufficient facts to state a colorable claim for malicious prosecution; (2) Count II, "deprivation of liberty," should be dismissed as to Hetzel, because no action by Hetzel is alleged to have contributed to a deprivation of liberty and because she is entitled to qualified immunity; (3) Count III (fabrication of evidence) should be dismissed as to Hetzel, both because she is not alleged to have fabricated evidence, to have testified at the grand jury proceeding, or to have had anything to do with the drafting of the Indictment or jury instructions, and because she is entitled to qualified immunity; (4) Count IV should be dismissed because (a) the Fourteenth Amendment does not afford relief for a violation of the right to be free from criminal prosecution except upon probable cause; (b) Hetzel is not

alleged to have violated the plaintiffs' substantive due process rights; and (c) even if she were, she is entitled to qualified immunity; (5) Count VI should be dismissed as to Hetzel because (a) the Complaint does not allege facts establishing her involvement in purported prosecutorial misconduct; (b) a claim for prosecutorial misconduct is not independently cognizable under § 1983; and (c) in any event, Hetzel is entitled to qualified immunity; and (7) the Complaint fails to allege facts supporting the existence of a conspiracy with sufficient specificity, and Hetzel, in any event, is entitled to either absolute or qualified immunity with respect to the acts the plaintiffs identify as her "overt acts" of participation in the alleged conspiracy. (Doc. No. 27, at 6–15.)

Regarding the state tort claims, Hetzel asserts that (1) if all federal claims are dismissed, then the court should decline to exercise supplemental jurisdiction over the remaining state law claims against her; (2) Hetzel is entitled to absolute immunity under Tenn. Code Ann. § 9-8-307(h); (3) she is entitled to qualified or "good faith" immunity under state law; and (4) the Complaint fails to allege sufficient facts to support the state tort claims against Hetzel. (Doc. No. 27, at 15–20.)

### A.     Hetzel's Alleged Involvement in the Prosecution

As with the claims against Helper and Evins, an examination of what the Complaint actually alleges about Hetzel is required in order to determine the basis for the claims against her.

Aside from her involvement in the 2018–2019 DCS removal proceedings against Hancock[12] and her allegedly rude and disrespectful comments about Reguli, which are not the actual subject of this lawsuit, Hetzel allegedly used the DCS proceeding against Hancock to obtain

---

[12] The plaintiffs confirm, in their Response to Hetzel's motion, that they "do not claim a constitutional violation in the underlying juvenile court case." (Doc. No. 33, at 11.) It is clear in any event that claims arising from the DCS proceeding would be time-barred, as the removal petition was dismissed in 2019, and this lawsuit was not filed until 2024.

a "secret subpoena to obtain records from the hotel where Reguli met with Hancock to discuss" the DCS case and then failed to disclose the subpoena to Reguli or turn over copies of the documents received in response to the subpoena. (Compl. ¶ 58.) She later "admitted that she had obtained the video footage from the Comfort Inn prior to meeting with Defendant Russ, therein collecting evidence and investigating the alleged crime herself." (*Id.* ¶ 99.) She admitted at Reguli's trial that the reason she subpoenaed records from the Comfort Inn was because she was "*indignant* over Reguli's conduct." (*Id.* ¶ 122.)

On August 30, 2018, Hetzel drafted a narrative to her supervising attorneys at DCS, "asking for permission to 'approach the Williamson County District Attorney about pursuing criminal charges against Connie Reguli." (*Id.* ¶ 86.) In September or October 2018, Hetzel traveled to the Brentwood Police Department to meet with Russ to turn over the results of her subpoena and instigate an investigation into Hancock and Reguli's conduct. (*Id.* ¶¶ 68, 99.)

Hetzel was identified as a witness on the criminal Indictments against Hancock and Reguli. (*Id.* ¶ 79.)[13] However, Hetzel, as a "seasoned" attorney, allegedly knew that "the conduct of Reguli and Hancock was not a crime. There was never a violation of a visitation order as required under the law of custodial interference." (*Id.* ¶¶ 86, 87; *see id.* ¶ 167 ("Hetzel knew that no crime had been committed by Reguli or Hancock but wanted to inflict personal and financial burdens on [them].").) Hetzel sat at counsel table during the entirety of Hancock's and Reguli's criminal trials. (*Id.* ¶¶ 100, 122.) Hetzel testified at Reguli's sentencing hearing. (*Id.* ¶ 140.)

---

[13] Hetzel states that it is clear from the Indictments themselves that she was identified on a list of witnesses to be subpoenaed, not that she actually testified before the grand jury. (*See* Doc. No, 27, at 8 n.5.)

**B.     The Federal Claims Under § 1983**

    *1.     Malicious Prosecution (Count I)*

Count I asserts a claim for malicious prosecution under the Fourth Amendment. A malicious prosecution claim requires proof of the following elements:

> (1) a criminal prosecution was initiated against the plaintiff, and the defendant made[,] influenced, or participated in the decision to prosecute; (2) there was a lack of probable cause for the criminal prosecution; (3) the plaintiff suffered a deprivation of liberty, as understood under Fourth Amendment jurisprudence, apart from the initial seizure; and (4) the criminal proceeding was resolved in the plaintiff's favor.

*King v. Harwood*, 852 F.3d 568, 580 (6th Cir. 2017) (citing *Sykes v. Anderson*, 625 F.3d 294, 308–09 (6th Cir. 2010)).

The only concrete acts Hetzel is alleged to have performed are that, in the context of the underlying DCS case, she obtained a "secret subpoena" for the hotel records, including video records, and then turned over the material obtained through that subpoena to the Brentwood Police Department and to prosecutors, in order to influence that BPD to institute its own investigation of Reguli and, by inference, to influence the prosecutors to prosecute.

Hetzel asserts that she is entitled to absolute immunity for the act of obtaining the subpoena for records, because she did this in her capacity as an advocate in the underlying DCS proceedings. The plaintiffs allege, however, that she did this specifically because she was "indignant" about Reguli's conduct and sought proof of her criminal conduct. (Doc. No. 1 ¶ 122.) In addition, it is not clear that Hetzel ever had an intention to use the subpoenaed information in the underlying DCS proceedings or, for that matter, whether Hetzel was still looking for probable cause to support the removal of Hancock's children from her custody. In other words, it is not clear from the face of the Complaint that Hetzel is entitled to absolute immunity in connection with obtaining the subpoena. Insofar as obtaining the subpoena was for the purpose of investigating potentially

criminal behavior by Reguli and Hancock, it would constitute an investigative act that was fairly attenuated from the judicial proceedings against Reguli and Hancock.

Hetzel also argues that the Complaint fails to state a malicious prosecution claim against her because the plaintiffs cannot show that Hetzel influenced the decision to prosecute. (Doc. No. 27, at 7.) She asserts that the allegations in the Complaint indicate only that her meeting with Russ resulted in a decision to *investigate*, not a decision to *prosecute* and that, moreover, the Sixth Circuit has held, in the context of a malicious prosecution claim against police officers, that "an officer will not be deemed to have commenced a proceeding against a person when the claim is predicated on the mere fact that the officer turned over to the prosecution the officer's *truthful* materials." *Sykes*, 625 F.3d at 314 (citations omitted; emphasis in original). The plaintiffs do not appear to claim that the issuance or execution of the subpoena actually violated their rights; nor do they allege that Hetzel made false statements in her application for the subpoena or turned over any falsified evidence to the prosecutors.

The plaintiffs do not actually address this argument, other than to argue (in the context of refuting Hetzel's qualified immunity claim) that Hetzel acted as a "private person," rather than as a social worker or other state official, in connection with this case and that she "falsified evidence"—simply by her failure to produce a visitation order and her knowledge that she and the other defendants "lacked an essential element of the crime." (*See* Doc. No. 33, at 14, 16.) According to the plaintiffs, "the lack of a visitation order was a material omission and that information was necessarily withheld from the grand jury." (*Id.* at 16.)

This argument is patently without merit. Hetzel was a state employee, and she clearly acted under color of law when she turned over investigative materials she obtained in her capacity as a DCS employee to law enforcement agents. More to the point, she is not alleged to have hidden

from law enforcement or prosecutors the fact that there was no visitation order. She did not falsely profess to have one; nor did she forge a fraudulent visitation order. She is alleged to have simply turned over her investigative materials to the police and discussed with them her belief that Reguli and Hancock should be prosecuted. Nothing in the Complaint suggests that she hid the ball from the police or prosecutors, and their decision to prosecute is not alleged to have been premised upon false representations or material omissions by Hetzel. The court finds that, insofar as the Complaint is premised upon Hetzel's obtaining investigative materials and turning them over to the police and prosecutors, and even assuming that she urged police and prosecutors to investigate and to prosecute, the Complaint fails to state a malicious prosecution claim against her.

Even if the facts as alleged were sufficient to state a claim, Hetzel is also entitled to qualified immunity. The doctrine of qualified immunity protects "all public officials" from civil damages "unless their conduct violated a 'clearly established statutory or constitutional right[] of which a reasonable person would have known.'" *Siggers v. Alex*, No. 22-1182, 2023 WL 5986603, at *4 (6th Cir. Sept. 12, 2023) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). This standard protects "all but the plainly incompetent or those who knowingly violate the law." *Id.* (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)). As the Sixth Circuit has explained,

> [a] right is clearly established if, at the time of the challenged conduct, it was sufficiently clear [such] that every reasonable official would [have understood] that what he is doing violates that right. Though we do not require a case directly on point, existing precedent must have placed the statutory or constitutional question beyond debate. The touchpoint for this inquiry is whether the defendant had fair warning his conduct was unconstitutional. So, in instances where a general constitutional rule applies with obvious clarity to a particular case, factually similar decisional law is not required to defeat a claim of qualified immunity.

*Id.* (internal quotation marks and citations omitted; other alterations in original).

Here, while the right to be free from prosecution without probable cause was well established at the time of the plaintiffs' prosecutions, the plaintiffs cannot show that Hetzel had

"fair warning" that her act of subpoenaing records from the hotel and then turning over truthful investigatory materials to law enforcement officers and prosecutors might subject her to liability for malicious prosecution. She is entitled to qualified immunity for that action.

Aside from those actions and allegedly "stay[ing] in constant contact" with Russ, the plaintiffs allege that Hetzel was identified as a witness during the grand jury presentment, sat at counsel table during Hancock's and Reguli's trials, and testified at trial and at Reguli's sentencing hearing. However, the plaintiffs do not allege that Hetzel falsified information, doctored the records she turned over to the police and prosecutors, or testified falsely. Generally, even if they had alleged that she testified falsely, a witness is entitled to absolute immunity for testifying at a court proceeding, irrespective of whether she perjured herself or presented falsified evidence. *See Rehberg v. Paulk*, 566 U.S. 356, 367 (2012) (confirming that grand jury and trial witnesses have "absolute immunity with respect to *any* claim [in § 1983 cases] based on the witness' testimony").

The court finds that the Complaint fails to state a claim for malicious prosecution against Hetzel and, alternatively, that Hetzel is entitled to qualified immunity or absolute immunity as to this claim.

### 2. *Deprivation of Liberty (Count II)*

It is unclear how, exactly, the plaintiffs' "deprivation of liberty" claim differs from their malicious prosecution claim, insofar as the deprivation of liberty they allege took place when, *after the Indictments were issued*, they turned themselves in for arrest and booking. The only named defendant alleged to have been involved in the arrest and booking process is Russ. (*See* Compl. ¶¶ 73–74.) Insofar as the plaintiffs are attempting to assert a claim against Hetzel for false arrest, as distinct from malicious prosecution, the Complaint simply fails to allege facts suggesting that Hetzel had any involvement in this purported deprivation of liberty.

Moreover, the Sixth Circuit has explained that "malicious prosecution under the Fourth Amendment . . . encompasses wrongful investigation, prosecution, conviction, and incarceration." *Sykes v. Anderson*, 625 F.3d 294, 308 (6th Cir. 2010) (quoting *Barnes v. Wright*, 449 F.3d 709, 715–16 (6th Cir. 2006)). "The tort of malicious prosecution is entirely distinct from that of false arrest, as the malicious-prosecution tort remedies detention accompanied not by absence of legal process, but by *wrongful institution* of legal process." *Robertson v. Lucas*, 753 F.3d 606, 616 (6th Cir. 2014) (quoting *Sykes*, 625 F.3d at 308) (emphasis in original). False arrest (or false imprisonment), on the other hand, pertains to a detention without probable cause *prior* to the institution of legal process. *See Tlapanco v. Elges*, 969 F.3d 638, 652 (6th Cir. 2020) ("To prevail on a false arrest claim under § 1983, 'a plaintiff [must] prove that the arresting officer lacked probable cause to arrest the plaintiff.'" (quoting *Voyticky v. Vill. of Timberlake*, 412 F.3d 669, 677 (6th Cir. 2005)). The deprivation of liberty claim simply alleges one of the elements of the plaintiffs' malicious prosecution claim—the deprivation of liberty—and elaborates upon the damages the plaintiffs suffered as a result of that deprivation of liberty. Count II does not state a claim independent of the malicious prosecution claim set forth in Count I. It too will be dismissed as to Hetzel.

### a)       *Fabricated Evidence (Count III)*

Like the claim against Helper and Evins, Count III is premised upon the allegation that Hetzel (among others)

> knew that the presentment made to the grand jury materially omitted any evidence of a visitation order that provided for the "expiration of a lawful period of visitation" as required by statute for the purpose of criminalizing the plaintiffs. Hetzel never gave a visitation order to Russ, Evins, and O'Neil. . . . This was a knowing and intentional[] omission intended to influence the jury and convict the Plaintiffs . . . .

(Compl. ¶ 172 [sic].)

As with the "deprivation of liberty" claim, it is not entirely clear that the Fourth Amendment countenances a "fabrication of evidence" claim aside from one couched in terms of malicious prosecution. Regardless, the Complaint does not actually allege that Hetzel fabricated evidence. She simply turned over her investigative materials to law enforcement and prosecutors. She did not fabricate or falsify a visitation order; she did not falsely claim that a visitation order existed or that Hancock violated such an order; she is not alleged to have misled anyone with regard to the existence or non-existence of a visitation order. The prosecutors' (and the judge's) decision to allow the custodial interference claim to proceed in the absence of a visitation order cannot be attributed to Hetzel, and the Complaint fails to state a Fourth Amendment claim against Hetzel based on the purported fabrication of evidence. And again, insofar as this claim is premised upon Hetzel's testimony before the grand jury or at trial, she is entitled to absolute immunity for such testimony, even if she testified falsely.

### 3. *The Fourteenth Amendment Claims*

Count IV purports to assert a claim for violations of the plaintiffs' Fourteenth Amendment right to substantive due process based on "lack of subject matter jurisdiction" and their right to be "free[] from wrongful prosecution." (Compl. ¶ 174 [sic].) Count VI purports to assert a claim under the Fourteenth Amendment for "prosecutorial misconduct" and references only Helper and Evins. (Compl. ¶¶ 181, 186 [sic].) The plaintiffs allege that Hetzel "participated in this entire fraudulent prosecution to punish and prosecute the Plaintiffs, and interfere with an election. It was an arbitrary and abusive exercise of government power." (Compl. ¶ 181 [sic].)

In *Albright v. Oliver*, 510 U.S. 266, 268 (1994), the Supreme Court expressly declined to "recognize a substantive right under the Due Process Clause of the Fourteenth Amendment to be free from criminal prosecution except upon probable cause." Instead, "[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort

of government behavior, that Amendment"—in this case, the Fourth—"not the more generalized notion of substantive due process, must be the guide for analyzing these claims." *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 842 (1998) (citations omitted); *accord Johnson v. Ward*, 43 F. App'x 779, 782 (6th Cir. 2002) (affirming the district court's ruling that "Plaintiff's Fourteenth Amendment due process claim for malicious prosecution fails to assert a constitutional violation upon which he can premise a section 1983 action"). The plaintiffs' "wrongful prosecution" and "lack of subject matter" claim under the Fourteenth Amendment (Count IV) fails to state a claim for which relief may be granted.[14]

The plaintiffs fail to explain how they can assert a "prosecutorial misconduct" claim against Hetzel, who was merely a witness in the criminal proceedings against them, not a prosecutor. On that basis alone, the claim is subject to dismissal as to Hetzel. Moreover, the Fourteenth Amendment does not provide a basis for bringing a civil claim for prosecutorial misconduct, separate from a Fourth Amendment claim for malicious prosecution—particularly when the two claims are based on identical conduct. This claim, too, will be dismissed for failure to state a claim for which relief may be granted as to Hetzel.

### 4. Conspiracy

Hetzel argues that the Complaint fails to articulate a conspiracy claim with the required specificity, particularly in that it fails to allege facts supporting an inference that Hetzel shared a single plan to prosecute the plaintiffs. (Doc. No. 27, at 15.) She also asserts that she is entitled to

---

[14] "Subject matter jurisdiction concerns a court's 'lawful authority to adjudicate a controversy brought before it' and is conferred on a court by statute or the constitution." *Griffin v. Campbell Clinic, P.A.*, 439 S.W.3d 899, 902 (Tenn. 2014) (quoting *Johnson v. Hopkins*, 432 S.W.3d 840, 843 (Tenn. 2013)). If the plaintiffs believed the Williamson County court lacked jurisdiction over them because the indictment failed to allege criminal conduct, their remedy would have been to file a motion to dismiss for lack of subject matter jurisdiction in that court. *See, e.g.*, *State v. Nixon*, 977 S.W.2d 119, 121 (Tenn. Crim. App. 1997).

either qualified or absolute immunity with respect to this claim, to the extent that she is entitled to qualified or absolute immunity for the acts that allegedly constitute participation in a conspiracy, including turning over evidence to police and prosecutors and testifying before the grand jury or at trial.

The court agrees that the Complaint fails to state a colorable § 1983 conspiracy claim as to Hetzel. As set forth above, Hetzel is entitled to qualified immunity for her acts relating to the investigation of the plaintiffs' conduct and absolute immunity for testifying. This claim will be dismissed as well.

### C.       The State Law Claims

As set forth above, the Complaint also articulates state law claims against all of the individual defendants for malicious prosecution, intentional infliction of emotional distress, abuse of process, and conspiracy to commit the same torts (Counts VIII through XI).

Hetzel argues that these claims should be dismissed under § 1367 if the federal claims against her are dismissed, but that argument is without merit, as discussed in the court's rejection of the same argument raised by Helper and Evins, because the court is not dismissing *all* of the claims over which it has original jurisdiction.

Hetzel also invokes immunity under Tenn. Code Ann. § 9-8-307(h). Under Tenn. Code Ann. § 9-8-307(h), "[s]tate officers and employees are absolutely immune from liability for acts or omissions within the scope of the officer's or employee's office or employment, except for willful, malicious, or criminal acts or omissions or for acts or omissions done for personal gain." The plaintiffs oppose dismissal based on statutory immunity, arguing that they plausibly allege that Hetzel acted with malice and that she was "not performing any of the discretionary functions of her position as a DCS attorney" or within the scope of that employment when she engaged in the conduct for which she is sued in this case. (Doc. No. 33, at 24.) The court agrees that, at a

minimum, the plaintiffs adequately allege malice on the part of Hetzel, such that immunity on the basis of § 9-8-307(h) does not provide a basis for dismissal.

Alternatively, Hetzel asserts that she is entitled to qualified or good-faith immunity under Tennessee law and that, in any event, the Complaint fails to state colorable claims under state law for which relief may be granted. The court considers these two arguments in tandem in connection with each of the state law claims.

### 1. State Law Malicious Prosecution

"The elements for malicious prosecution are the same regardless of whether the underlying action was criminal or civil." *Mynatt v. Nat'l Treasury Emps. Union, Chapter 39*, 669 S.W.3d 741, 746 (Tenn. 2023) (citation omitted). To state a claim for malicious prosecution, the plaintiff must allege facts sufficient to show that "the defendant instituted or continued a judicial proceeding against the plaintiff (1) without probable cause and (2) with malice and that (3) the proceedings terminated in the plaintiff's favor." *Id.* (internal quotation marks and citation omitted). Where a claim for malicious prosecution is based on the continuation of a prosecution, the defendant must "tak[e] an active part in or exercise[e] control over a prosecution." *Gordon v. Tractor Supply Co.*, No. M2015-01049-COA-R3-CV, 2016 WL 3349024, at *9 (Tenn. Ct. App. June 8, 2016).

Hetzel argues that the plaintiffs' allegations are not sufficient to give rise to an inference that she initiated the criminal prosecution or continued it after it began and that the plaintiffs cannot show that there was an absence of probable cause. In addition, she asserts that she is entitled to qualified immunity under Tennessee law.

"Tennessee recognizes a state-law qualified-immunity defense to state tort actions against government officers for their discretionary functions." *Hammond-Beville v. Landis*, No. 21-5498, 2022 WL 910569, at *5 (6th Cir. Mar. 29, 2022) (citing *Youngblood v. Clepper*, 856 S.W.2d 405 (Tenn. Ct. App. 1993). The defense is analogous to the qualified-immunity defense recognized

under federal law for state officers sued under 42 U.S.C. § 1983, the primary difference being that, in analyzing state qualified immunity, the court must determine whether the defendant "committed a clearly established state tort violation." *Id.* "Otherwise, the federal and state qualified-immunity analyses are 'the same'" *Id.*; *see also Cawood v. Booth*, No. E2007-02537-COA-R3-CV, 2008 WL 4998408, *11–12 (Tenn. Ct. App. Nov. 25, 2008) (citing federal law as relevant to whether the defendants were entitled to qualified immunity for state law torts); *Rogers v. Gooding*, 84 F. App'x 473, 477 (6th Cir. 2003) (affirming the district court's grant of qualified immunity on Tennessee assault and battery claims, noting that immunity to § 1983 claims derived from common law immunity).

Thus, the relevant question for qualified immunity purposes is whether existing precedent was sufficient to put a reasonable state officer on notice that the events in question could constitute malicious prosecution. The court finds, for the same reasons as those articulated in connection with the dismissal of the federal malicious prosecution claim, that, even if Hetzel is considered to be the complaining witness who instituted criminal proceedings against the plaintiffs, she is entitled to qualified immunity based on her actions as alleged in the Complaint. She obtained a subpoena for the hotel records in the underlying DCS litigation but turned that evidence over to the BPD and Williamson County prosecutors. She encouraged the BPD to open its own investigation. Although she allegedly stayed in contact with the police, may have testified at the grand jury presentment, did testify at trial, and sat at counsel table with the state prosecutor, she is not alleged to have falsified or forged evidence, withheld evidence, testified falsely, or provided falsified documents. She never maintained that Hancock violated a visitation order. While the tort of malicious prosecution is well established, the plaintiffs have not pointed to any remotely analogous cases in which an officer who provided true information to law enforcement officers

and encouraged them to engage in further investigation was subjected to liability for malicious prosecution.

The plaintiffs attempt to circumvent that conclusion by urging that Hetzel "was not performing a discretionary function of her employment" and therefore cannot claim qualified immunity. (Doc. No. 33, at 25.) However, the fact, as alleged in the Complaint, that Hetzel sought permission from her supervisors to approach Williamson County prosecutors about pursuing criminal charges against Reguli (*see* Compl. ¶ 86) is sufficient to establish that she was acting within the scope of her job. Her acts as alleged in this case were not taken in her free time as a member of the general public.

Hetzel is entitled to qualified immunity on this claim.

### 2. *Intentional Infliction of Emotional Distress*

There are three elements of a claim for intentional infliction of emotional distress under Tennessee law:

1. The conduct complained of must be intentional or reckless.

2. The conduct must be so outrageous that it is not tolerated by a civilized society.

3. The conduct complained of must result in serious mental injury.

*Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn.1997). In *Bain*, the Tennessee Supreme Court noted that it had previously "adopted and applied the high threshold standard" set forth in the Restatement (Second) of Torts:

> The cases thus far decided have found liability only where the defendant's conduct has been extreme and outrageous. It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree as to go beyond all bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an

average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

*Bain*, 936 S.W.2d at 623 (quoting Restatement (Second) of Torts § 46 comment d (1965)).

Outrageous conduct does not include "mere insults, indignities, threats, annoyances, petty oppression or other trivialities." *Lane v. Becker*, 334 S.W.3d 756, 762–63 (Tenn. Ct. App. 2010) (quoting *Levy v. Franks*, 159 S.W.3d 66, 83 (Tenn. Ct. App. 2004). "It is not an easy burden to meet the essential elements of outrageous conduct." *Id.* at 762.

It is well established under Tennessee law that the trial court must "determine, in the first instance, whether a defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery," such that "the trial court may reasonably dismiss this legal theory as a matter of law." *Id.* at 762.

It does not appear that Tennessee courts have ever permitted malicious prosecution allegations, standing alone, to satisfy the high standard for pleading intentional infliction of emotional distress. *Accord, e.g.*, *id.* at 763 (affirming dismissal of IIED claim based on the defendant's actions of taking the plaintiff's deposition and filing a lawsuit against him); *see also Levy*, 159 S.W.3d at 83 (reversing dismissal of IIED claim where, in addition to allegations that supported the plaintiffs' malicious prosecution claim and punitive damages, they also showed that, after the plaintiffs complained to zoning officials about the defendants' use of their property, the defendants responded by engaging in "threatening and intimidating behavior," including repeated threats of violence, firing gun shots over the plaintiffs' property, and other intentionally harassing behavior). Hetzel's alleged actions in this case are simply not sufficiently outrageous to state a claim for IIED. This claim will be dismissed for failure to state a claim for which relief may be

granted.[15]

### 3. *Abuse of Process*

A claim for abuse of process requires proof of only two elements "'(1) the existence of an ulterior motive; and (2) an act in the use of process other than such as would be proper in the regular prosecution of the charge.'" *Cordova v. Martin*, 677 S.W.3d 654, 659 (Tenn. Ct. App. 2023) (quoting *Bell ex rel. Snyder v. Icard, Merrill, Cullis, Timm, Furen & Ginsburg, P.A.*, 986 S.W.2d 550, 555 (Tenn. 1999)), appeal denied (Oct. 11, 2023). A claim for abuse of process is based on the "improper use of process after it has been issued"—unlike malicious prosecution, which arises "for maliciously causing process to issue." *Id.*

"[T]he mere filing or maintenance of a lawsuit—even for an improper purpose—is not a proper basis for an abuse of process action." *Bell ex rel. Snyder*, 986 S.W.2d at 556 (citation omitted). Likewise, "[t]here is no liability where the defendant has done nothing more than carry out the process to its authorized conclusion, even though with bad intentions." *Id.* Rather, the bad intentions "must culminate in an actual abuse of the process 'by perverting it to a use to obtain a result which the process was not intended by law to effect.'" *Id.* at 555 (quoting *Priest v. Union Agency*, 125 S.W.2d 142, 144 (Tenn. 1939)). "The improper purpose usually takes the form of coercion to obtain a collateral advantage, not properly involved in the proceeding itself, such as the surrender of property or the payment of money, by the use of the process as a threat or a club." *Id.* (quoting W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 121, at 898 (5th ed. 1984)); *see also* Restatement (Second) of Torts § 682 ("The usual case of abuse of process is one

---

[15] "Because IIED claims are analogous to personal injury actions, the one-year statute of limitations in Tenn. Code Ann. § 28-3-104(a)(1) applies." *Goetz v. Autin*, No. W2015-00063-COA-R3-CV, 2016 WL 537818, at *10 (Tenn. Ct. App. Feb. 10, 2016) (citing *Mackey v. Judy's Foods, Inc.*, 867 F.2d 325, 329 (6th Cir. 1989)). Hetzel did not move for dismissal of this claim on statute of limitations grounds, but she also has not waived the defense.

of some form of extortion, using the process to put pressure upon the other to compel him to pay a different debt or to take some other action or refrain from it.").

The Complaint fails to point to any improper act by Hetzel (or any other defendant) that took place after the issuance of process that would qualify as abuse of the judicial process. The only actions Hetzel took after issuance of process were to testify at both plaintiffs' trials and sit at counsel table during the trials. She is entitled to absolute immunity for testifying at trial, even if she testified falsely. *See Brown v. Birman Managed Care, Inc.*, 42 S.W.3d 62, 72 (Tenn. 2001) ("Tennessee law recognizes the testimonial privilege, which gives a witness who testifies in a judicial proceeding immunity from damages sought in a later civil suit based on his allegedly false testimony."). And even the plaintiffs do not maintain that sitting at counsel table could give rise to a claim for abuse of process.[16]

This claim will be dismissed for failure to state a claim for which relief may be granted.

### 4. Conspiracy

Since the plaintiffs' abuse of process and IIED claims fail, any conspiracy claim related to these charges also fails because, "if the claim underlying the allegation of civil conspiracy fails, the conspiracy claim must also fail." *Levy*, 159 S.W.3d at 82 (citations omitted). As for the malicious prosecution claim, the Complaint does not allege facts establishing a conspiracy with sufficient particularity, as set forth above in connection with the § 1983 conspiracy. This claim,

---

[16] As the Tennessee Court of Appeals also observed in *Cordova*, abuse of process claims are subject to a different accrual rule than malicious prosecution claims. The latter do not accrue until the termination of judicial proceedings in the plaintiff's favor. Abuse of process claims "accrue, and the statute of limitations begins to run, from the termination of the acts which constitute the abuse complained of, and not from the completion of the action which the process issued." *Cordova*, 677 S.W.3d at 660 (quoting *Blalock v. Preston L. Grp., P.C.*, No. M2011-00351-COA-R3CV, 2012 WL 4503187, at *7 (Tenn. Ct. App. Sept. 28, 2012)). Hetzel did not move for dismissal of this claim on statute of limitation grounds, but she has not waived the defense here either.

too, will be dismissed for failure to state a claim.

## V.    CONCLUSION

For the reasons set forth herein, Helper and Evins' Motion to Dismiss (Doc. No. 23) will

be granted in part and denied in part, and Hetzel's motion (Doc. No. 26) will be granted.

An appropriate Order is filed herewith.


_____
ALETA A. TRAUGER
United States District Judge